FILED
United States Court of Appeals
Tenth Circuit

**PUBLISH**

**January 16, 2015**

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

|  |  |
|---|---|
| IN RE: GOLD RESOURCE CORPORATION SECURITIES LITIGATION. _____ NITESH BANKER; SCOTT CANTOR; ROBERT D. RHODES, on behalf of themselves and all others similarly situated, Plaintiffs - Appellants, v. GOLD RESOURCE CORPORATION; JASON D. REID, WILLIAM W. REID, DAVID C. REID; BRADLEY J. BLACKETOR, Defendants - Appellees. | No. 13-1323 |

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:12-CV-02832-RBJ)**

_____

John Michael DeStefano III of Hagens Berman Sobol Shapiro LLP, Phoenix, Arizona (Steve W. Berman, Erin K. Flory and Karl P. Barth of Hagens Berman Sobol Shapiro LLP, Seattle, Washington; Leif Garrison of Hagens Berman Sobol Shapiro LLP, Colorado Springs, Colorado; Darren J. Robbins, Trig R. Smith and Danielle S. Myers of Robbins Geller Rudman & Dowd LLP; and Kip B. Shuman of The Shuman Law Firm, Boulder, Colorado, on the briefs), for Plaintiffs-Appellants.

Peter A. Wald of Latham & Watkins LLP, San Francisco, California (Matthew Rawlinson of Menlo Park, California; and Gregory J. Kerwin and Allison K. Kostecka of Gibson, Dunn & Crutcher LLP, Denver, Colorado, with him on the brief), for Defendants-Appellees.

Before **BACHARACH**, **SEYMOUR**, and **MURPHY**, Circuit Judges.

**SEYMOUR**, Circuit Judge.

This appeal arises from a putative securities fraud class action brought by lead plaintiff Nitesh Banker on behalf of all persons who purchased common stock in Gold Resource Corporation (GRC) during the class period between January 30, 2012, and November 8, 2012. Plaintiff alleges GRC and four of its officers and directors committed securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. § 78j(b), and Securities Exchange Commission (SEC) Rule 10b-5, 17 C.F.R. § 240.10b.5. He also asserts claims against individual defendants as "control persons" in violation of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). The district court dismissed the complaint with prejudice pursuant to Fed. R. Civ. P. 12(b)(6), holding that plaintiff failed to meet the heightened pleading standard for scienter required by the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4(b)(1)-(2).[1] *In re Gold Res. Corp. Sec. Litig.*, 957 F. Supp. 2d 1284 (D. Colo.

---

[1] The PSLRA requires that:

2013).  Plaintiff appeals, and we affirm.

# I

GRC, a Colorado corporation, is a publicly traded mining company engaged in Mexico in the exploration and production of precious metals, including gold and silver.  During the relevant time period, GRC employed seven full-time employees in the United States and over 300 Mexican nationals at six properties in the Mexican State of Oaxaca.  The individual defendants are four GRC officers and directors: William C. Reid, co-founder, CEO, and Chairman; Jason D. Reid, President and Director; David C. Reid, co-founder, Vice-President, Secretary, and Treasurer; and Bradley J. Blacketor, CFO.

The facts of this appeal arise out of commercial production at GRC's *El Aguila* property in Mexico.  The *El Aguila* project consisted of an open-pit mine and an underground mine at the *La Arista* vein system.  Commercial production

---

[T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

[T]he complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(1)-(2).

started in July 2010, initially by mining and processing ore from the open-pit mine.  GRC began developing underground mine access to the *La Arista* vein system and actively started stockpiling ore from it by November 2010.  Its operations there included "stoping," which involved "the removal of ore from an underground mine, leaving behind an open space known as a stope," and "long-hole stoping," a "stoping technique" that "can be the lowest cost method of mining when large ore bodies are located in strong country rock."  Aplt. App. at 16.  The company anticipated that all of its mining operations in 2011 and 2012 would take place at the *La Arista* vein system.

GRC's aggressive business plan called for a dramatic increase in mining production during its initial years.  It planned on increasing production from 70,000 ounces of AuEq[2] in its first year of mining to 100,000 in the second year and to 120,000 in each of the following four years.  The plan also included a considerable dividend program for shareholders.

Plaintiff alleges the *El Aguila* project experienced severe production problems during the class period, and that defendants knew about these problems but concealed them from investors.  *Id.* at 30 ¶ 49.  He claims GRC's aggressive

---

[2] AuEq is "used by GRC to measure its production performance, and means precious metal gold equivalent."  Aplt. App. at 16.  This production measurement is  "determined by taking the silver payable metal ounces produced and converting them to the dollar equivalent of gold by using the gold to silver average price ratio.  The gold and silver average prices used are the actual metal prices realized from the sales of metals concentrate."  *Id.*

expansion of underground mining operations created difficulties that lowered production and required the company to mine lower grade zones of deposits. He also alleges that "[s]ignificant operational efficiency improvements were required," the absence of which limited GRC's "ability to mine higher grade stopes," and that "[d]ecreases in long-hole stoping . . . forc[ed] GRC to process more diluted development and mine from areas of the deposit with lower metal grades." *Id.* Consequently, plaintiff asserts, mining production measured by metric tons of stoping as a percentage of milled ore decreased from fifty-five percent during the first quarter of 2011 to fourteen percent during the second quarter of 2012.

Plaintiff further alleges GRC inflated its production statistics by improperly "recognizing 'sales' that were not actual sales of product mined, but were part of an overbilling scheme." *Id.* at 19 ¶ 9. GRC had only two buyers to whom it sold all of its concentrate – subsidiaries of the Trafigura Group. GRC would use "provisional invoices" calculated from its own sampling and assaying results. Each buyer paid 90 percent of the provisional invoice price, and "GRC recognize[d] revenue based upon these provisional invoices." *Id.* at 31 ¶ 51. After delivery to the buyer's facility, an additional "final sample" was taken, and the price paid by the buyer was then adjusted to the final sample results. The final sample set the actual sales price under the contract between GRC and

Trafigura.[3]  Plaintiff alleges defendants were aware of "significant" differences in the provisional invoices and the buyer's final sample assays by "February 2012," *id.* at ¶ 54, but continued to misstate revenues to investors until the fall.  What plaintiff characterizes as the "overbilling scheme" was not disclosed publicly by GRC until November 8, 2012, when GRC announced it would have to restate its financial results for the first two quarters of 2012.

After denying plaintiff's motion to strike or disregard portions of defendants' reply brief, the district court dismissed with prejudice plaintiff's first amended and consolidated complaint.  It held that plaintiff failed to plead sufficient factual information to establish a strong inference of scienter regarding any of the alleged false or misleading statements, as required by the PSLRA.  The court therefore also dismissed plaintiff's claim against the individual defendants as "control persons" under § 20(a) of the Exchange Act.  *In re Gold Res. Corp.*, 957 F. Supp. 2d at 1302.

## II

On appeal, plaintiff contends the district court erred in dismissing his securities fraud claim, asserting the first amended complaint "contains a wealth of

---

[3] "The contract . . . allow[ed] for a third-party or 'umpire' assay to be obtained in the event of a material difference between GRC's numbers and the buyers' numbers."  Aplt. App. at 31 ¶ 53.

allegations establishing both the material false statements and Defendants' scienter."[4]  Aplt. Br. at 19.  We first set out the applicable standards.

"We review *de novo* the district court's dismissal under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted."  *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1092 (10th Cir. 2003).  In reviewing a Rule 12(b)(6) motion to dismiss a § 10(b) action, "we must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff."  *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1118 (10th Cir. 1997) (internal quotation marks omitted).  Further, we "must consider the complaint in its entirety, as well as other sources," including "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

Section 10(b) of the Exchange Act prohibits the "use or employ[ment], in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as

---

[4] Plaintiff also makes an argument on appeal based on Item 303 of Regulation S-K.  17 C.F.R. 229.303; *see also Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1197 (10th Cir. 2013).  While plaintiff's complaint contains this assertion, he failed to raise it in his memorandum in opposition to defendants' motion to dismiss.  Accordingly, we decline to address it.  *See Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1228 (10th Cir. 1996) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below.").

the Commission may prescribe." 15 U.S.C. § 78j(b).  SEC rule 10b-5 implements § 10(b) by making it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5.  Thus, § 10(b) "affords a right of action to purchasers or sellers of securities injured by its violation." *Tellabs*, 551 U.S. at 318.

"A plaintiff suing under [§] 10(b), however, bears a heavy burden at the pleading stage." *In re Level 3 Communications, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012).  To properly state a claim for securities fraud, a plaintiff's complaint must allege facts supporting the following:

> (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.

*Adams*, 340 F.3d at 1095.

In addition, the PSLRA created a heightened pleading standard applicable to the first and third of these elements. *Id.* at 1095-96.  Under the PSLRA, in order to overcome a motion to dismiss, the complaint must "specify each statement alleged to have been misleading, the reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on

which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B).  With respect to the

scienter requirement – "a mental state embracing intent to deceive, manipulate, or

defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976) – it is not

sufficient "for a plaintiff to allege generally that the defendant acted with

scienter, as permitted under Fed. R. Civ. P. 9(b)."  *Level 3*, 667 F.3d at 1333; *see*

*also City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1258 (10th Cir.

2001) ("Before the passage of the PSLRA, the pleading requirements for scienter

in the securities context were governed by [Fed. R. Civ. P.] 9(b), which dictates

that 'averments of fraud . . . be stated with particularity.'").  Rather, the plaintiff

must, "with respect to each act or omission alleged to violate this chapter, state

with particularity facts giving rise to a strong inference that the defendant acted

with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A).  "The inquiry . . .

is whether *all* of the facts alleged, taken collectively, give rise to a strong

inference of scienter, not whether any individual allegation, scrutinized in

isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23.  Moreover,

> [t]he strength of an inference cannot be decided in a vacuum.  The
> inquiry is inherently comparative: How likely is it that one
> conclusion, as compared to others, follows from the underlying facts?
> To determine whether the plaintiff has alleged facts that give rise to
> the requisite "strong inference" of scienter, a court must consider
> plausible, nonculpable explanations for the defendant's conduct, as
> well as inferences favoring the plaintiff.

*Id.* at 323-24.  Furthermore, "[a] complaint will survive . . . only if a reasonable

person would deem the inference of scienter cogent and at least as compelling as

any opposing inference one could draw from the facts alleged." *Id.* at 324.

### A. *Alleged false and misleading statements during the class period*

The class period in this case spans from January 30 to November 8, 2012. GRC's stock traded at $26.26 per share on the final day of trading before the class period.  Plaintiff claims that all of the statements set forth below were materially false and misleading because defendants were aware of serious production problems at the *El Aguila* mine as well as the overbilling scheme but failed to disclose these problems to investors.

On January 30, 2012, GRC issued a press release announcing "record" results with a production of 66,125 ounces of AuEq in 2011.[5]  The press release was attached to GRC's Form 8-K filed with the SEC on the same day.  It predicted the *El Aguila* mill would produce 120,000 to 140,000 ounces of AuEq in 2012.  Jason Reid stated: "We look forward to achieving our 2012 target as we continue on our trajectory for aggressive production and growth."  Aplt. App. at 33 ¶ 62.

GRC issued a press release on February 29, 2012, announcing its final results for 2011, as a "record" production of 66,169 ounces of AuEq.  On that same day, GRC filed its 2011 Form 10-K annual report with the SEC, stating

---

[5] We note that the press releases issued by defendants during the class period contained cautionary language advising investors of significant risks in the mining business.

"management concluded that we maintained effective internal control over financial reporting as of December 31, 2011." *Id.* at 34 ¶ 66. The 2011 Form 10-K also included a sworn certification by William Reid pursuant to § 302 of the Sarbanes–Oxley Act of 2002 (SOX) representing that he had overseen the company's systems of internal control and that the financial information contained in the 10-K was true in all material respects.

On March 1, 2012, William and Jason Reid held a conference call with investors to discuss the 2011 "record" results as well as current development at *La Arista* mine. William stated that "at this point in time, we feel comfortable that we will be able to achieve our 900 tons per day." *Id.* at 37 ¶ 70.

GRC issued a press release on April 9, 2012, announcing its preliminary first quarter production results of 30,500 ounces of AuEq at an average of 825 tons per day, which the company stated was "in line with its 2012 Outlook" because of "increased long-hole stoping." *Id.* at 39 ¶ 75. Jason Reid explained: "First quarter record production sets a firm base from which to continue our growth trajectory of producing more low cost ounces." *Id.* at 39 ¶ 76. On April 30, 2012, GRC issued a press release quoting Jason Reid as stating: "With record first quarter production, the increased April dividend to six cents per common share per month speaks to the positive outlook we have for the continued success and production of the Aguila Project." *Id.* at 40 ¶ 78.

GRC issued a similar press release on May 10, 2012, announcing record

-11-

first quarter results for 2012. Jason Reid noted that "[t]he first quarter set a strong base for the Company with record production, record revenues, and dividends of 7.9 million while focusing on aggressive growth." *Id.* at 41 ¶ 80. The same day, GRC filed its Form 10-Q quarterly report with the SEC for the first quarter of 2012, explaining that "[t]here was no change in our internal control over financial reporting." *Id.* at 42 ¶ 82. In addition, Jason Reid stated during a conference call on May 11, 2012, that GRC was "transitioning into more long-hole open stoping" which would result in "greater tonnages." *Id.* at 44-45 ¶ 84.

On July 19, 2012, GRC first announced production problems at the *El Aguila* mine, admitting that its "second quarter production was lower than expected" due to several factors. *Id.* at 47 ¶ 89. It revised its 2012 production outlook downward by fifteen percent. This caused GRC's stock to drop by more than thirty percent on the next day of trading.

GRC also announced disappointing second quarter results in a press release on August 9, 2012, with production equivalent to half of the first quarter. Jason Reid stated: "The second quarter was a challenge as infrastructure requirements slowed the development and stoping of high-grade ore zones at La Arista." *Id.* at 49 ¶ 96. GRC's Form 10-Q second quarter report to the SEC reiterated that "there was no change in our internal control over financial reporting." *Id.* at 49 ¶ 98.

William and Jason Reid tried to reassure investors during a conference call

on August 10, asserting that production problems were now behind them and that "production is going to be more of what we expect." *Id.* at 53 ¶ 104. William explained when asked by an investor that the fifty-five percent production from long-hole stoping reported for the first quarter was actually the high point for the quarter, not an average. The average for the first quarter was actually forty percent, dropping to twenty percent in the second quarter.

GRC announced its third quarter results on October 17, 2012, notifying investors that production was still lower than expected at 22,300 AuEq ounces. It revised its 2012 outlook to between 85,000 to 100,000 ounces of AuEq from the original target of 120,000 to 140,000 ounces. The press release also notified investors of an unresolved billing dispute with GRC's buyer, stating: "A dispute arose during the third quarter with the buyer of the Company's metal concentrates that involves the buyer's handling, control and sampling of those concentrates at the buyer's warehouse, and the resulting assays the buyer obtained from those samples." It explained: "The buyer is claiming net adjustments (reductions) to the Company's provisional invoices of approximately 2,300 AuEq ounces." *Id.* at 55 ¶ 112. The following day GRC's stock dropped ten percent.

On the last day of the class period, November 8, 2012, GRC issued a press release announcing that settlement of the billing dispute required restatement of the financial results it had previously reported. It submitted a Form 8-K to the SEC explaining that during the third quarter of 2012, executive management

became aware of "large variances between the results of the Company's preliminary assays used for determining the provisional sales price for its concentrate sales when compared to the assays obtained from samples after shipment to the buyer used to determine final pricing." *Id.* at 56-57 ¶ 116.   It further explained that GRC had settled the billing dispute, which required GRC to recognize the buyer's final sample assays taken in February and March 2012 for purposes of final invoice and payment.  As a consequence, GRC restated "its first and second quarter 2012 financial statements to reflect a net reduction to revenues of approximately $3.7 million for the six months ended June 30, 2012, of which $3.0 million represents the cash settlement with the buyer and $0.7 million represents a non-cash derivative adjustment." *Id.* at 57 ¶ 116.

> GRC also stated in its Form 8-K:
>
> The Company concluded that there was an internal control deficiency in its concentrate sales process that did not prevent or detect on a timely basis the material variance between the preliminary assay samples of the concentrates taken at the time at the mine site with those assay samples taken at the buyer's warehouse.  This deficiency constitutes a material weakness in the Company's control over financial reporting.  Management took immediate action to institute a remediation plan to correct the internal control and deficiency.  As of September 30, 2012, management believes the internal control deficiency has been remediated.

*Id.* at 57-58 ¶ 116.  Plaintiff alleges this statement proves "that, by at least September 30, 2012, the Company was not only aware that material problems existed with its systems of internal accounting control, but that it had already

taken remedial steps and allegedly had corrected the problems." *Id.* at 58 ¶ 117. The following day GRC's stock dropped $.50 per share to $16.48.

Plaintiff further contends GRC's first and second quarter 2012 financial statements were materially false and misleading because defendants improperly recognized revenue resulting from what plaintiff calls the overbilling scheme. Plaintiff claims defendants were aware of significant variances in the February assays within a month or two. Accordingly, he contends, four of defendants' statements in the first and second quarters of 2012 concerning the current state of GRC's financial outlook recognized false revenue.[6]

Plaintiff also asserts that GRC's failure to disclose production related problems at the *El Aguila* mine made several of defendants' statements materially misleading because GRC had a duty to disclose its "mounting production problems." Aplt. Br. at 24. In particular, plaintiff asserts that two statements made in the January 30, 2012, press release were materially misleading. First, he claims Jason Reid's statement concerning GRC's "record" production in 2011 was materially misleading because defendants were aware of serious production problems and had a duty to disclose them. Additionally, he claims Jason Reid's statement to investors that GRC was "continu[ing] on our trajectory for

---

[6] Plaintiff alleges the following financial statements recognized false revenue: "The Q1 2012 Form 10-Q filed on May 10, 2012"; "The May 11, 2012 conference call"; "The Q2 2012 Form 10-Q filed August 9, 2012"; and the "August 10, 2012 conference call." Aplt. App. at 70 ¶ 150.

aggressive production growth" materially misled investors because "[i]t did not warn investors that GRC achieved this record production by rushing its mining operations while deferring critical infrastructure improvements." Aplt. Br. at 27.

Plaintiff alleges that two statements from April 2012 were similarly misleading. On April 9, 2012, Jason Reid stated that "[f]irst quarter record production sets a firm base from which to continue our growth trajectory of producing more low cost ounces," which plaintiff claims was misleading because defendants did not simultaneously disclose the results were achieved by "unsustainable methods." Aplt. Br. at 27-28; Aplt. App. at 39 ¶ 76. Plaintiff asserts that GRC's press release on April 30, 2012, was misleading for the same reasons, when Jason Reid stated: "With record first quarter production, the increased April dividend to six cents per common share per month speaks to the positive outlook we have for the continued success and production trajectory of the Aguila Project." Aplt. Br. at 28; Aplt. App. at 40 ¶ 78.

Finally, plaintiff claims two statements concerning long-hole stoping were misleading. He challenges William Reid's statements from a conference call on March 1, 2012, in which he said GRC had a "new long-hole drill" that "is really going to help with the tonnage mined," aplt. br. at 29; aplt. app. at 37 ¶ 70, and Jason Reid's statement from a May 11, 2012, conference call, where he said GRC was "transitioning into more long-hole open stoping." Aplt. Br. at 29; Aplt. App. at 44-45 ¶ 84.

-16-

While defendants contest on appeal whether many of the alleged statements were misleading, we need not reach that issue.  Even assuming plaintiff has met the high standard of the PSLRA for pleading with particularity the existence of some materially misleading statements or omissions, his complaint must be dismissed unless plaintiff has also pled with particularity facts giving rise to a strong inference "that the defendants acted with scienter, which we define as 'a mental state embracing intent to deceive, manipulate, or defraud, or recklessness.'" *Level 3*, 667 F.3d at 1343 (quoting *Adams*, 340 F.3d at 1105). Accordingly, we turn to the issue of scienter.

### B.  Scienter

1.  Financial restatement

We first address the alleged overbilling scheme and the statements made by GRC regarding its profits in the first and second quarters, which had to be restated after GRC settled the dispute with its buyer.  Plaintiff must allege facts sufficient to raise a strong inference that defendants' representations were intentionally false or at least recklessly made.  "Recklessness" under § 10(b) is "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *Fleming*, 264 F.3d at 1245 (internal quotation marks omitted).  Negligence, even gross negligence, is not sufficient; something similar to "conscious disregard" is

-17-

required.  *Level 3*, 667 F.3d at 1343 n.12 (citations omitted).

Plaintiff sets forth eleven factors he claims collectively create a strong inference that defendants acted with scienter when it made financial statements that were materially false.  These include:

> (i) Defendants' admission of knowing that the reported financial information was false, (ii) the violated accounting rules' simplicity, (iii) the accounting misconduct concerned revenue recognition, (iv) GRC's actual accounting policies differed from its stated policies, (v) the accounting error's magnitude, (vi) the accounting misconduct required GRC to restate its financial statements, (vii) defendants' Sarbanes-Oxley certifications, (viii) senior management's role in the accounting misconduct, (ix) the accounting issue related to GRC's "core operations," (x) GRC's small number of employees, and (xi) an ancillary dispute's quick settlement.

Aplt. Br. at 36.

"Companies must adhere to generally accepted accounting principles ('GAAP') when recognizing revenue in their publicly disclosed financial statements."  *Dronsejko v. Thornton*, 632 F.3d 658, 662 (10th Cir. 2011).  The first six factors that plaintiff contends show a strong inference of scienter relate essentially to the same GAAP violation, the material overstatement of revenues.  We have held that "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim."  *Fleming*, 264 F.3d at 1261 (internal quotation marks omitted).  Thus, "[o]nly where such allegations are coupled with evidence that the violations or irregularities were the result of the defendant's fraudulent intent to mislead investors may they be

sufficient to state a claim." *Id.*

In *Adams*, 340 F.3d at 1106, for example, we held that the allegations in the complaint when considered as a whole gave rise to a strong inference of scienter with respect to some of the defendants. We found it persuasive that "the alleged GAAP violations come on top of other particularized facts indicating that a key operation of the company was losing money, [the CFO] knew that fact, and he falsely reported profit for it." *Id.* We explained: "The alleged GAAP violations in this case strengthen the inference that [the CFO] signed financial statements with intent to deceive, particularly in light of the detail with which the alleged GAAP violations are stated, . . . and the fact that the Company's financial reports declared that Kinder-Morgan's financial statements were prepared in accordance with GAAP." *Id.*

In the present case, however, we agree with the district court that "unlike in *Adams* where the court relied on other facts evincing knowledge of the defendant executive, the GAAP violations here do not 'come on top of other particularized facts indicating that a key operation of the company was losing money, [the defendant executives] knew that fact, and [they] falsely reported a profit for it.'" *In re Gold Res. Corp.*, 957 F. Supp. 2d at 1300-01 (alteration in original) (quoting *Adams*, 340 F.3d at 1106). As the district court noted, "[p]laintiff's arguments seem to misunderstand the need for *other* particularized facts showing fraudulent intent." *Id.* at 1301.

Plaintiff argues that we must view the allegations holistically, rather than individually, and that the nature of the accounting violations when read collectively with the five other factors creates a strong inference that defendants made the misleading revenue statements with scienter.  He points out that the GAAP procedure requiring delivery of the product before recognizing revenue was straightforward and simple, the accounting misstatements amounted to more than sixteen percent of net income for the first quarter of 2012, and they were made by management.  He argues that these facts coupled with the SOX miscertifications, the quick settlement made with the sole buyer, and the small size of the one-product company together create a strong inference that defendants, as the executives, "must have known" of the revenue misstatements at the time they occurred.

But plaintiff's view of the situation fails to take account of other plausible inferences arising from the facts stated in the amended complaint and the documents referred to therein.  For example, as defendants made clear in the November conference call, employees in Oaxaca did not immediately tell executives in Denver when they became aware of the variances showing up between their weighing of concentrate compared to the buyer's weighing because they thought the buyers' figures were wrong.[7]  As William Reid explained:

---

[7] Plaintiff referred to the transcript of this conference call in the amended complaint but then ignored most of its content.  The district court took judicial

Our relationship with the buyer from July of 2010 to January of 2012 was one where there were no significant variances between what we said the concentrates contain versus what the warehouse sample said they contain, with exception of 1 month in late 2011. *A confidence based on 19 months of experience had developed regarding our statement of what the concentrates contain and what the buyer's sample contained.* Essentially, no issue or significant problems existed 18 out of 19 initial months of our business relationship up to February of 2012.

One other thing I want to explain is that the assays of these samples for final invoice, even when just normal variations occur and an umpire assay is required, it can take 3 to 5 months to determine and finalize. We had no problem with January 2012 concentrate shipments, and they were closed out with a final payment as usual. *Because of our good history with the buyer and our knowledge of what we actually send to the buyer, when our project people in Oaxaca first saw significant variances in the February numbers, they immediately felt there was a definite mistake in those numbers. They then proceeded with the umpire assays, which required additional time, in the belief that this would demonstrate an error. So management in Denver was not notified of these issues regarding significant variances for February and later months until the third quarter when the umpire assay results had come back, and we could see that a pattern of large variances had developed.* Though some of our people in Oaxaca were aware of the variances within a month or 2 following shipment, they didn't communicate that up the ladder to us at the time as they were proceeding with the view that those numbers were wrong and would ultimately be corrected through the umpire assay process.

Supp. App at 162 (emphasis added). He further explained:

Once our people did communicate to us that we were consistently experiencing significant variances between the preliminary samples we were obtaining and samples being provided at the warehouse, management conducted an investigation to determine the cause of the discrepancies and disputed any payment adjustments that were due

---

notice of the entire transcript.

from the final invoices where these large variances have been identified.

*Id.*

It is certainly plausible that a prudent executive would want to investigate and confirm a claimed discrepancy before disclosing it publicly.  In a similar case, *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 755 (7th Cir. 2007), the company was required to restate the preceding three years' earnings in order to correct errors due to fraud at its Brazilian subsidiary.  Although an executive at headquarters learned of the fraud in May, he did not publicly disclose it until July 22.  *Id.* at 758.  Upholding dismissal of the complaint with prejudice, the court stated:

> The most one can say is that, sometime during May 2004, Baxter learned enough to lead a reasonable person to conduct an investigation.  That is exactly what Baxter did during the next two months, demonstrating a pursuit of truth rather than reckless indifference to the truth.  Knowing enough to launch an investigation (Baxter could not simply assume that the initial report of bad news was accurate) is a very great distance from convincing proof of intent to deceive.

*Id.*  The same is true in this case.

As William Reid further explained in the November conference call:

> The results of the investigation showed us that there were significant issues and deficiencies with controls and security at the buyer's concentrate yard that we believe could have compromised and affected various concentrate samples.  *To make a long story short, a critical mass of information built up in the third quarter that convinced us that the buyer had issues with its yard and the handling and sampling of our concentrates in their possession.  The buyer,*

-22-

> *however, took the position that even though we may know what we
> shipped from our site, we could not know what arrived at the yard.
> In other words, the concentrates could have been compromised in
> transit.*  Although we did not believe that to be the case, it was a
> possibility.  *Consequently*, we could not recover the entire amount.
> Our alternative was to take legal action, but *we made the decision to
> settle.  Our settlement with the buyer requires the buyer to accept
> our provisional invoices for April, May and June, but we must accept
> their assays for February and March, which translates to a $3
> million reduction in what our provisional invoice stated or
> approximately 1,800 gold equivalent less ounces for our sales.*  We
> have been working with our buyer to mitigate any potential future
> issues with the sampling and assaying process of our concentrate
> shipments.  *The buyer has demonstrated to us that it has improved its
> controls concerning security, handling and sampling of our
> concentrates.  And we have also instituted additional security
> measures by having our own representatives of the company remain
> with the shipment until samples of concentrate are obtained at the
> warehouse.*  Since implementing these additional measures, we have
> had no variances between our preliminary assays and the buyer's
> final assays for August and September.  Reconciliation of October is
> not yet calculated.

Supp. App. at 162 (emphasis added).  Notably, GRC's settlement with the buyer

resulted in GRC having to recognize a reduction of 1,800 gold equivalent ounces

in the amount sold rather than the 2,300 ounces initially claimed by the buyer.

Thus, GRC would have been imprudent had it publicly disclosed the amount

initially claimed by the buyer.

   In addition, although plaintiff claims that GRC was at least reckless in

recognizing as income the ninety percent it received from the buyer provisionally,

that is exactly what the buyer contracted to pay.  Rather than creating an

inference of recklessness, this accounting practice was acceptable to the buyer

and in accordance with the contract.

Plaintiff contends the defendants' § 302 SOX certifications show a strong inference of scienter because "[a]ssuming William Reid and Blacketor's sworn SOX certifications were true, 'significant variances' in the measurement of metals sold to GRC's only customer could not have occurred without GRC's CEO and CFO's knowledge." Aplt. Br. at 42. This argument is at best an assertion that defendants were negligent: it offers no particularized facts to support an inference that defendants knew their sworn SOX statements were false at the time they were made. The "bare allegation" that defendants lied when they certified GRC's financial statements pursuant to SOX adds "nothing substantial to the scienter calculus." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000, 1003-04 (9th Cir. 2009) (citing cases).

The remaining factors plaintiff relies on to show a strong inference of scienter with respect to the revenue GRC recognized provisionally are equally insufficient. Most of them rest on what appears to be a negligence theory. The assertion that because the company was small, produced only one product, and had only one buyer, and that therefore defendants "must have known" of the misleading nature of the financial statements in the first and second quarter is simply insufficient under the heightened pleading requirements to establish a strong inference of scienter in the circumstances of this case. As the district court pointed out, "the relevant personnel are separated by nearly 2,000 miles and

international borders." *In re Gold Res. Corp.*, 957 F. Supp. 2d at 1301.

Defendants' explanation regarding the delay in their receiving notice of the

variances, particularly given the several months it took until the umpire assays

were finalized, states a plausible, opposing inference.  Defendants had every

reason not to disclose the disputed variance before the dispute was investigated

and settled.

2.  Production problems

With respect to the production problems GRC faced, plaintiff alleges that in

the first quarter of 2012 defendants intentionally "deferr[ed] critical mine

infrastructure [including upgrading electric power, expanding ventilation

requirements, and handling of increased water flow] to speed Q1 mining

production and 'generate cash on an accelerated basis.'"  Aplt. Reply Br. at 7-8.

This deferral of critical infrastructure, he alleges, "was on its face unsustainable

and reduced Q2 production." *Id.* at 8.  Plaintiff contends that the following facts

create a strong inference of scienter: "(i) the production problems' obvious

nature, (ii) the El Aguila mine was GRC's 'core operation,' (iii) Defendants' role

as GRC's officers, and (iv) the small number of GRC employees."  Aplt. Br. at

49.  Referring to the August 10, 2012, conference call GRC held, plaintiff alleges

defendant William Reid admitted "it is axiomatic that as we go deeper, we're

going to get more and more water," aplt. app. at 52 ¶ 104, contending that this

admission shows that the nature of the production problems GRC encountered

were obvious.  Plaintiff contends the facts that the *El Aguila* project was GRC's only mining activity and defendants are highly experienced in mining adds to the inference that "they must have been aware that GRC's unsustainable 1Q 2012 tactics were causing massive undisclosed production problems."  Aplt. Br. at 50.

"But in the context of scienter, we must consider plausible opposing inferences as well."  *Level 3*, 667 F.3d at 1345.  Doing so paints a different picture of the mining business, one in which it is not always possible to anticipate what miners will face as they dig deeper.  For example, in the August conference call William Reid explained that the "increased ventilation, increased power distribution and handling of increased water flow" were issues that "took on unexpected and above average proportion of effort, as this also impacted the safety of our miners and our employees."  Supp. App. 148.  He stated: "Safety will always come first and foremost before pushing for production.  Because of this situation, we mined [in the second quarter] some areas of the La Arista deposit that were known to be low-grade zones but were safer areas of the mine, while we diligently worked to bring our high-grade stopes into production safely."  *Id.* at 148-49.  He also pointed out that $CO_2$ gas was sometimes an additional problem with increased water flow, requiring more ventilation.  *Id.* at 151.

Defendants addressed the water, ventilation, and electrical power issues in the November conference call as well, explaining that in the second quarter they

had "encountered stronger-than-expected watercourses not previously encountered by our exploration drilling." *Id.* at 163. Jason Reid noted that they had also faced unusually high "dilution" problems, explaining that "[d]ilution is a waste rock, a non-ore bearing rock that gets included during the mining process which dilutes and lowers the head grade of the ore when it is processed in the mill." *Id.* at 164. He added that they had finally been able to attract a number of new and more experienced employees who were better equipped to address these problems. *Id.* at 163-64. In the question and answer period of that conference call, William Reid stated: "[T]his is the mining business, and we will always have issues to solve as we constantly open up new areas underground that could and will, at times, hold surprises, some good and some not so good . . . to be clear, we will always have challenges with water being underground." *Id.* at 168. Jason Reid commented further: "We tripped in the second quarter dealing with real world issues that were not anticipated but are part and parcel of the mining business." *Id.*

Defendants' explanations of the second quarter production problems are as plausible as plaintiff's inference that defendants intentionally ignored or "consciously disregarded" problems that should have been anticipated in advance.[8] The risks of the mining business were fully set out for investors in the

---

[8] We note that defendants hold eighteen percent of the stock of GRC and that there is no allegation they sold any of it during the class period. While

cautionary statements issued to them.[9]

3. Conclusion

Having assessed plaintiff's complaint holistically, setting out the alleged

material misrepresentations and omissions and evaluating plaintiff's plausible

inferences against the opposing inferences plausibly drawn from the explanations

defendants gave in the conference calls it had with investors, we are not

---

"motive can be a relevant consideration in making the scienter determination, and personal financial gain may weigh heavily in favor of a scienter inference," *Level 3*, 667 F.3d at 1345 (internal quotation marks and citation omitted), the absence of any allegation of a financial benefit from the alleged fraud cuts the other way.

[9] For example, in GRC's 2011 Form 10-K annual report, Item 1A clearly sets forth risk factors associated with mining, including the fact that GRC "incurred substantial losses in the past," and that investors may lose all or part of their investment as a result of "[u]nexpected interruptions" in the mining business. Supp. App. at 42. Specifically, GRC explained:

> Our underground mining operations are subject to unique risks. The exploration for minerals and the development and production of mining operations from an underground mine involve a high level of risk and are often affected by hazards outside of our control. Some of these risks include, but are not limited to, underground fires or floods, fall-of-ground accidents, seismic activity and unexpected geological formations or conditions including noxious fumes or gases. The occurrence of one or more of these events in connection with our exploration, development, or production activities may result in the death of, or personal injury to, our employees, other personnel or third parties, the loss of mining equipment, damage to or destruction of mineral properties or production facilities, monetary losses, deferral or unanticipated fluctuations in production, environmental damage and potential legal liabilities, all of which may adversely affect our reputation, business, prospects, results of operations and financial position.

*Id.* at 45.

persuaded a reasonable person would deem an inference of scienter more cogent or compelling than an opposing inference of nonfraudulent intent with respect to the misrepresentations plaintiff alleges.

## III

Plaintiff also argues that the district court erred by dismissing his claim against individual defendants for violating § 20(a) of the Exchange Act.  "[T]o state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) control over the primary violator by the alleged controlling person."  *Fleming*, 264 F.3d at 1270 (alteration in original) (internal quotation marks omitted).  Because the district court properly dismissed plaintiff's claims relating to primary violations of the securities laws, plaintiff's § 20(a) claim necessarily also fails.

## IV

Plaintiff contends the district court abused its discretion when it dismissed the first amended complaint with prejudice because it denied him the opportunity to amend it without providing any explanation.  We review for abuse of discretion a district court's failure to grant leave to amend.  *Grossman*, 120 F.3d at 1126.

As defendants point out, however, the district court was not required to give an explanation for dismissing the complaint with prejudice when plaintiff's

request for leave to amend amounted to a single sentence at the end of his

memorandum in opposition to the motion for summary judgment.  Defendants

rely on *Calderon v. Kansas Department of Social & Rehabilitation Services*, 181

F.3d 1180, 1187 (10th Cir. 1999), where we declined to reverse a district court's

failure to grant leave to amend because "Ms. Calderon's single sentence, lacking

a statement for the grounds for amendment and dangling at the end of her

memorandum, did not rise to the level of a motion for leave to amend."  We

concluded "that a request for leave to amend must give adequate notice to the

district court and to the opposing party of the basis of the proposed amendment

before the court is required to recognize that a motion for leave to amend is

before it."  *Id.* at 1186-87.

This case is similar.  The district court did not abuse its discretion in

dismissing the complaint with prejudice where plaintiff's memorandum contained

only one sentence at the very end of his brief alternatively requesting leave to

amend in the event the district court should decide to dismiss his complaint.


**V**

Finally, plaintiff asserts the district court erred in denying his motion to

strike or disregard portions of defendants' reply in support of their motion to

dismiss.  Essentially, plaintiff contends defendants advanced new arguments for

the first time in their reply brief.  While it is true that we generally do not "review

issues raised for the first time in a reply brief, we make an exception when the new issue argued in the reply brief is offered in response to an argument raised in the [plaintiff's] brief." *Beaudry v. Corr. Corp. of Am.*, 331 F.3d 1164, 1166 n.3 (10th Cir. 2003) (internal quotation marks and citation omitted).  Citing *Beaudry*, the district court explained that defendants were replying to arguments plaintiff raised in its response brief.  We are not persuaded the court erred in so concluding.  Accordingly, we cannot say the court abused its discretion in denying plaintiff's motion to strike or disregard portions of defendants' reply.  Moreover, our review of the district court's dismissal of the complaint is de novo, and plaintiff has had a full opportunity to make all his arguments on appeal.

## VI

In sum, we affirm the district court's decision to dismiss plaintiff's first amended and consolidated complaint with prejudice.  In so doing, we conclude the district court did not abuse its discretion in failing to grant plaintiff leave to amend, or in denying plaintiff's motion to strike or disregard portions of defendants' reply.